# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

| | |
|---|---|
| **MARTHA WHITTEN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION NO. 3:12-CV-0951-** |
| ) | **VEH** |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

The plaintiff, Martha Whitten, brings this action pursuant to the provisions of 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration denying her application for Title II disability insurance benefits. Whitten timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I. STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is

reasonable and supported by substantial evidence." *Id.* (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*. This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Id*. Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence. *Id.*

Unlike the deferential review standard applied to the Commissioner's factual findings, "no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determination of the proper standards to be applied in reviewing claims." *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982) (quoting *Smith v. Schweiker*, 646 F.2d 1075, 1076 (5th Cir. Unit A Jun.1981)). Therefore, this court reviews de novo the Commissioner's conclusions of law. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007). The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## II. STATUTORY AND REGULATORY FRAMEWORK

To qualify for disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations outline a five-step process that is used to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). The Commissioner must determine in sequence:

(1) whether the claimant is currently engaged in substantial gainful activity;

(2) whether the claimant has a severe impairment or combination of impairments;

(3) whether the claimant's impairment meets or equals the severity of an impairment in the Listing of Impairments;[1]

(4) whether the claimant can perform any of his or her past work; and

(5) whether there are significant numbers of jobs in the national economy that the claimant can perform.

*Winschel v. Comm'r of Soc. Sec*, 631 F.3d 1176, 1178 (11th Cir. 2011). The evaluation process continues until the Commissioner can determine whether the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant who is doing substantial gainful activity will be found not disabled at step one. 20 C.F.R. §§ 404.1520

---

[1] The Listing of Impairments, ("Listings") found at 20 C.F.R. Part 404, Subpart P, Appendix 1, are used to make determinations of disability based upon the presence of impairments that are considered severe enough to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525.

(a)(i), 416.920(a)(4)(i). A claimant who does not have a severe impairment will be found not disabled at step two. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A claimant with an impairment that meets or equals one in the Listing of Impairments will be found disabled at step three. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

Prior to considering steps four and five, the Commissioner must assess the claimant's residual functional capacity (RFC), which will be used to determine the claimant's ability to work. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant who can perform past relevant work will be found not disabled at step four. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five the burden shifts to the Commissioner to show other work the claimant can do. *Foot v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). To satisfy this burden the Commissioner must produce evidence of work in the national economy that the claimant can do based on the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(f), 416.912(f). A claimant who can do other work will be found not disabled at step five. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920 (a)(4)(v). A claimant who cannot do other work will be found disabled. *Id.*

Whitten filed a previous application, which was denied by an Administrative Law Judge (ALJ) in a decision issued July 23, 2007.[2] R. 11. Her request for administrative

---

[2] The same ALJ issued both the July 23, 2007, decision, and the August 26, 2011, decision, which is the subject of the current appeal.

review was denied, and she did not appeal that decision.[3] R. 11. Therefore, the doctrine of res judicata bars Whitten from asserting a claim for benefits within the period adjudicated by that prior claim. *See* 20 C.F.R. § 404.957(c)(1). Whitten acknowledged this by amending her alleged onset date to July 24, 2007. R. 225, 27.

In the present case, Whitten is seeking Title II disibility insurance benefits. Based on Whitten's earnings records, she has sufficient quarters of coverage to remain insured through December 31, 2007. R. 10. Therefore, Whitten must establish that she became disabled on or before December 31, 2007, her date last insured (DLI). *See* 42 U.S.C. § 423(d)(1)(A); *Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002). This means Whitten must show that she became disabled on or after July 24, 2007, but before January 1, 2008.

The ALJ determined Whitten did not engage in substantial gainful activity from her alleged onset date through her DLI. R. 13. He found that through her DLI she had the severe impairments of "osteoporosis, scoliosis, and mild degenerative changes at L4/L5 and L5/S1." R. 13. The ALJ concluded Whitten did not suffer from a listed impairment through her DLI. R. 14. He found Whitten had the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), with additional restrictions. R. 14. She was not to work at unprotected heights, or around dangerous,

---

[3] The ALJ in the present case determined the prior application could not be reopened under any of the grounds specified in the regulations. R. 11. Courts have no jurisdiction to review the Commissioner's decision not to reopen a prior claim absent a colorable constitutional claim. *See Califano v. Sanders*, 430 U.S. 99, 107-09 (1977).

5

moving, or unguarded machinery. R. 14. She also could not climb ropes, ladders or scaffolds. R. 14. With this RFC, the ALJ found Whitten unable to perform her past relevant work. R. 16.

When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines ("the grids") to establish the presence of other jobs at step five.[4] *Foote*, 67 F.3d at 1558-59. The presence of a non-exertional impairment (such as pain, fatigue, or mental illness) also prevents exclusive reliance on the grids. *Id.* at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." *Id*. Based on Whitten's RFC, and the testimony of a vocational expert (VE), the ALJ found Whitten could perform other work in the national economy. R. 16-17, 48-51. Therefore, he found she was not disabled at step five of the sequential evaluation framework at any time prior to her DLI. R. 17.

### III. FACTUAL BACKGROUND

Whitten filed her current application for a period of disability and disability insurance benefits on June 10, 2010. R. 10. She initially alleged she became disabled on October 4, 2002, but amended her alleged onset date to July 24, 2007, the day following

---

[4] The Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P, Appendix 2, are used to make determinations of disability based upon vocational factors and the claimant's residual functional capacity when the claimant is unable to perform his vocationally relevant past work. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a). Such determinations, however, are only conclusive when all of the criteria of a particular rule are met. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(a).

the ALJ's decision on her prior claim. R. 169, 27, 225. Whitten was 48 years old on her DLI. R. 16. She has at least a high school education, and past relevant work as a sewing machine operator. R. 16. Whitten alleges she was disabled as of December 31, 2007, because of back pain, and problems using her hands because of osteoporosis and degenerative disc disease. R. 33-38.

As the ALJ observed, most of the medical evidence falls either before July 24, 2007, or after December 31, 2007. Records several months prior to the previous ALJ decision show that on April 18, 2007, she saw Dr. Hunt, a rheumatologist, who noted Whitten presented with "a significantly good response to Naproxen." R. 241. Dr. Hunt noted Whitten's range of motion in her back showed "significant improvement," and that she was "no longer having any morning stiffness of note." R. 241. She was to return for a followup visit in four months. R. 241.

On August 15, 2007, Dr. Hunt noted Whitten "returns with a very good response from the standpoint of stiffness on Naproxen." R. 281. Dr. Hunt noted she had "not regained any of her limited limitations in range of motion but has only 15 to 20 minutes of morning stiffness and no peripheral joint tenderness." R. 281. Whitten was to follow up in six months – or sooner, if needed – at which time Dr. Hunt would review a bone density scan that was to be done in the near future. R. 281. The bone scan was performed on October 3, 2007, and showed significant osteoporosis. R. 255.

Whitten did not return to Dr. Hunt until March 12, 2008, approximately two and one-half months after her DLI. R. 280. Dr. Hunt noted Whitten had "very little discomfort as a consequence of ankylosing spondylitis."[5] R. 280. He noted she had "clearly improved substantially" on Naproxen. R. 280. He indicated Whitten reported "a lot of trouble with short term memory and admits that she is depressed." R. 280. Whitten was to make an appointment to discuss those issues with her primary care physician. R. 280. There are additional treatment records from Dr. Hunt, but they are too distant in time from Whitten's DLI to be relevant to her claim.

During the relevant time period, Whitten saw Dr. Auxier, her primary care physician, only once. On September 5, 2007, she saw Dr. Auxier for an annual physical. R. 317. She reported that she was "still depressed [at] times." R. 317. Dr. Auxier's physical examination of Whitten's back, neck and extremities was normal. R. 317. She diagnosed Whitten with vaginitis and weakness and prescribed Cymbalta. R. 317.

Whitten did not see Dr. Auxier again until November 12, 2008, (eleven months after her DLI) when physical examination of Whitten's back, neck, and extremities was again normal. R. 316. The treatment note does not indicate any complaints of symptoms related to Whitten's osteoporosis or degenerative disc disease. R. 316.

---

[5] Ankylosing spondylitis "is an inflammatory disease that can cause some of the vertebrae in [the] spine to fuse together. This fusing makes the spine less flexible and can result in a hunched-forward posture." http://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/basics/definition/con-20019766 (last visited March 12, 2014).

## IV. ISSUES PRESENTED

Whitten's brief raise the following issues: 1) Whether the ALJ erred in finding the medical records did not demonstrate any significant changes in her condition after his July 23, 2007, decision; 2) whether the ALJ erred in rejecting Whitten's allegation that she cannot perform work activity for a complete work day, or maintain acceptable work attendance; and 3) whether the ALJ failed to properly evaluate the limitations alleged by Whitten related to her ability to perform repetitive activities with the upper extremities.

## V. DISCUSSION

### A.

Whitten argues the medical records from her treating doctors "demonstrated a progression in the claimant's impairments which is inconsistent with her limitations remaining constant between her first and second [ALJ] decisions." Pl.'s Br. 7. The ALJ's 2011 decision rests on his finding that there had been no significant changes in Whitten's condition after his decision on July 23, 2007, but before January 1, 2008. The ALJ observed that there was little medical evidence during that time period:

> The claimant simply does not have any medical evidence that indicates any significant changes from the findings of the ALJ decision, dated July 23, 2007. The majority of the evidence falls within the period of time prior to the date of the decision, or following the date through which the claimant was last insured for Title II benefits, December 31, 2007.

R. 15. The ALJ concluded that "a review of the evidence shows no evidence of any worsening of the claimant's impairments from the time of the previous administrative law judges decision on July 23, 2007 through December 31, 2007, her date last insured."

9

R. 16. Therefore, he found Whitten's RFC had not changed since the earlier decision.[6] R. 16.

At Whitten's ALJ hearing, her attorney stated that an October 3, 2007, bone density scan showed that her condition had worsened. R. 28. That scan showed significant osteoporosis. R. 255. However, the October 2007 bone density scan is not, by itself, sufficient to show Whitten was more restricted by her impairment after July 23, 2007. *See McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir.1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality."); *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) ("[T]he mere existence of these impairments does not reveal the extent to which they limit [the claimant's] ability to work or undermine the ALJ's determination in that regard.").

In his decision, the ALJ noted that the October 2007 bone density scan showed "a decrease in bone mineral density consistent with osteoporosis." R. 16. However, he explained that Whitten's "osteoporosis was considered in the previous administrative law judge's decision," and that the results of the new scan "do not show any significant

---

[6] The RFC finding in the ALJ's earlier decision was the same as in the decision under review on this appeal. R. 93.

increase of osteoporosis since previous testing."[7] R. 16. Moreover, the treatment records support the ALJ's finding that none of Whitten's impairments worsened significantly during the relevant period of time.

The only treatment note during the relevant time period from Dr. Hunt, Whitten's treating rheumatologist, was from August 15, 2007. At that visit, he found Whitten had a "very good response from the standpoint of stiffness," and had "no peripheral joint tenderness." R. 281. When Whitten next saw Dr. Hunt on March 12, 2008 (several months after her DLI), he noted that she had "very little discomfort as a consequence of ankylosing spondylitis" and that she had "clearly improved substantially" on Naproxen. R. 280. Dr. Hunt's treatment records, therefore, show Whitten's condition was improving.

There is also only one treatment note during the relevant time period from Dr. Auxier, Whitten's primary care physician. That note, dated September 5, 2007, does not indicate Whitten reported any symptoms from her osteoporosis or degenerative disc disease. R. 317. Additionally, Dr. Auxier's physical examination of Whitten's back, neck, and extremities was normal. R. 317. Whitten did not see Dr. Auxier again until November 12, 2008 – eleven months after her DLI – when physical examination of Whitten's back, neck, and extremities was again normal. R. 316. That treatment note does not indicate any complaints of symptoms related to Whitten's osteoporosis or

---

[7] In his July 23, 2007, decision, the ALJ found Whitten had osteoporosis, and that it was a severe impairment. R. 99.

degenerative disc disease. R. 316. Therefore, Dr. Auxier's treatment notes show no worsening of Whitten's condition.

The treatment records provide substantial evidence to support the ALJ's finding that Whitten's condition did not worsen during the relevant time period. Therefore, the ALJ did not err in finding Whitten's RFC remained unchanged from the RFC assessed in the July 23, 2007 decision.

## B.

Whitten also argues the ALJ did not properly consider her ability to perform work activity for a complete workday or the impact of her alleged inability to maintain acceptable work attendance. Pl.'s Br. 7-8. The focus of her argument is addressed to whether the ALJ's RFC finding took into account her ability to sustain work activities on a regular and continuing basis. *Id.* at 8. In assessing Whitten's RFC, the ALJ was required to consider her physical abilities "on a regular and continuing basis." *See* 20 C.F.R. § 404.1545(b) ("When we assess your physical abilities, we first assess the nature and extent of your physical limitations and then determine your residual functional capacity for work activity on a regular and continuing basis."). There is no indication in the ALJ's decision that his RFC finding did not take into account Whitten's ability to work on a regular and continuing basis as required by the regulations. Therefore, the ALJ's finding that Whitten had the RFC to perform sedentary work with additional restrictions must be presumed to represent a finding that the work could be done on a regular and continuing basis.

The ALJ also found that Whitten's allegations were not credible to the extent they were inconsistent with his RFC finding. R. 15. As discussed above, the ALJ's finding that there had been no significant change in Whitten's condition between the first ALJ decision and her DLI is supported by substantial evidence. Therefore, the ALJ did not err in rejecting Whitten's testimony about her ability to sustain work on a regular and continuing basis.

C.

Whitten argues that the ALJ failed to properly evaluate her allegations of limitations "related to her ability to perform repetitive activities with the upper extremities." Pl.'s Br. 9. The ALJ discussed Whitten's testimony "that she cannot use her hands to wrap gifts."[8] R. 15. However, he did not find Whitten had a severe impairment of her upper extremities. R. 13. Nor did he include any restrictions in the use of Whitten's upper extremities in his RFC assessment. R. 14. The ALJ made the same findings in his 2007 decision. R. 92, 93.

None of the treatment notes during the relevant time period show any complaints of worsening symptoms that would affect Whitten's ability to use her upper extremities. Moreover, although Whitten argues the ALJ did not properly evaluate her allegations of difficulties with the use of her upper extremities, she has not shown any diagnosis of a medically determinable impairment that would affect Whitten's use of her upper

---

[8] Whitten testified at her hearing on July 27, 2011, that she had been unable to wrap Christmas gifts in December 2007. R. 33.

extremities. As discussed above, the ALJ's finding that there had been no significant changes in Whitten's condition between the first ALJ decision and her DLI is supported by substantial evidence. Therefore, the ALJ did not err in failing to include restrictions on Whitten's use of her upper extremities in his August 2011 RFC finding.

## VI. CONCLUSION

Based upon the court's evaluation of the evidence in the record and the parties' submissions, the court finds that the Commissioner's decision is supported by substantial evidence and that she applied proper legal standards in arriving at it. Accordingly, the court will affirm the decision by separate order.

**DONE** and **ORDERED** this the 31st day of March, 2014.

*[signature]*
**VIRGINIA EMERSON HOPKINS**
United States District Judge